Filed 1/14/15  P. v. Humes CA4/2

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>v.<br><br>LAWRENCE LIVINGSTON HUMES et al.,<br><br>　　　　Defendants and Appellants. | E057619<br><br>(Super.Ct.No. SWF028727)<br><br>O P I N I O N |

APPEAL from the Superior Court of Riverside County.  Mark Mandio, Judge.

Affirmed.

Patricia J. Ulibarri, under appointment by the Court of Appeal, for Defendant and Appellant Lawrence Livingston Humes.

David McNeil Morse, under appointment by the Court of Appeal, for Defendant and Appellant Michael Guy.

1

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Charles C. Ragland and Teresa Torrreblanca, Deputy Attorneys General, for Plaintiff and Respondent.

## I.  INTRODUCTION

Defendants and appellants Lawrence Livingston Humes and Michael Guy were tried together before separate juries and convicted of robbing two store clerks at a Murrieta CVS store on May 5, 2009.  (Pen. Code, § 211, counts 2 & 3.)[1]  Humes was also convicted of falsely imprisoning the clerks (§ 236, counts 4 & 5), and possessing a firearm as a felon (former § 12021, subd. (a), count 6).  The juries found each defendant personally used a firearm in committing the crimes.  (§§ 12022.53, subd. (b), counts 2 & 3, 12022.5, subd. (a), counts 4 & 5.)[2]

The prosecution presented "other crimes" evidence that defendants robbed three employees of another CVS store in Encinitas on May 16, 2009 (the Encinitas robbery), 11 days after the Murrieta robbery.  The juries heard Guy was convicted of the Encinitas

---

[1]  All further statutory references are to the Penal Code unless otherwise indicated.

[2]  Humes was charged in count 1 with kidnapping for robbery (§ 209, subd. (b)(1)), but count 1 was dismissed after the court found insufficient evidence to support the charge and granted Humes's motion for acquittal on the charge (§ 1118.1).  In count 7, Guy was charged with possessing a firearm as a felon (former § 12021, subd. (a)), but a mistrial was declared on count 7 after Guy's jury failed to reach a verdict on it, and the count was dismissed.

The court found Humes had four prison priors, one prior serious felony conviction, and one prior strike conviction, and Guy had two prior serious felony convictions and two prior strike convictions.  (§§ 667.5, subd. (b), 667, subds. (a), (c)-(e).)  Humes was sentenced to 34 years 8 months in prison.  Guy was sentenced to 10 years, plus 25 years to life.

robbery, but Humes had not been tried for the Encinitas robbery. The other crimes evidence was admitted on the issues of each defendant's identity, as well as their intent, in committing the Murrieta robbery. (Evid. Code, § 1101, subd. (b).)

Each defendant claims the admission of the other crimes evidence was an abuse of the trial court's discretion under Evidence Code sections 352 and 1101, subdivision (b), and deprived them of their due process right to a fair trial. This is the only claim Guy raises on appeal, and he does not join Humes's other claims. Humes raises additional claims of error and challenges the sufficiency of the evidence supporting his robbery and false imprisonment convictions. We affirm the judgments in all respects.

## II. FACTS AND PROCEDURAL HISTORY

A. *The (Charged) Murrieta CVS Store Robbery*

On May 5, 2009, Lacey Reinhardt was working as a night shift supervisor at a 24-hour CVS store on Hancock Avenue in Murrieta. Around 2:40 a.m., a man she identified in court as Humes[3] walked into the store while she was on her lunch break. Humes followed Reinhardt behind the counter and had a small silver gun in his hand. Reinhardt did not know whether the gun was a revolver or a semiautomatic. The gun was pointed towards the ground, and Humes said: "I'm going to need you to open your safe."

_____

[3] Reinhardt described the man as a tall, light-skinned, African-American, wearing a coat and hat. She identified Humes in court as the robber, saying his face was "burned into [her] brain" and her certainty of her identification was "[e]xcellent. Very high." She got a good look at Humes's face when he first walked into the store and again when she was emptying the registers. On May 19, 2009, two weeks after the Murrieta CVS robbery, Reinhardt identified Humes from a six-pack photographic lineup, saying: "This one for sure."

3

Reinhardt walked from the front counter to the safe, a distance of around 15 feet, with Humes following her. At that point, a second man Reinhardt identified in court as Guy,[4] came into the store and headed towards the back, by the pharmacy.

Reinhardt opened the safe, Humes took the money from the safe, then Reinhardt opened the cash registers, and Humes emptied them. Humes then told Reinhardt to open the "black boxes" where the larger bills were kept, and followed her as she retrieved the keys to the black boxes. After Reinhardt opened the black boxes, Guy approached, and Humes ordered Reinhardt to follow Guy to the back of the store. A surveillance videotape of the robbery, showing Humes, Guy, and Reinhardt in the store, was played for the jury.

Guy took Reinhardt to a hallway in the back of the store near the restrooms, used duct tape to tie her wrists, and sat her against a wall with her coworker, Donna Bebik, who was on her knees, facing the wall, with her wrists taped together. Reinhardt described Guy as "angry," "mean," and "awful." He taped her wrists so tightly her hands blistered and turned purple. Reinhardt never saw Guy with a gun, however.

A minute or two after Humes and Guy left the store, Bebick removed the duct tape from her and Reinhardt's wrists, and called 911. A recording of her 911 call was played for the jury.

---

[4] At trial, Reinhardt described the second man as African-American like Humes but shorter, a little stocky, and darker skinned. Reinhardt tentatively identified the second man in court as Guy, saying she was only "[m]edium" sure Guy was the second man because she spent less time with him than Humes. She "thought" the second man was Guy but she was unsure.

Around 2:30 a.m., before the robbery, Bebick was in the lunchroom in the back of the store upstairs. She came downstairs, heard alarms sounding, and called to Reinhardt. She then heard someone running in the liquor aisle behind her; she turned around and saw a Black male in a black-hooded sweatshirt with a cap and glasses, holding a silver revolver. The man said, "[d]on't look at me," and Bebik looked down. She only saw the man's face for a few seconds. The man was carrying a silver revolver.

Bebik initially testified she "believe[d]" the man in the liquor aisle was Guy because Guy looked "kind of similar."[5] When asked to explain how certain she was of her in-court identification of Guy, she said she was 100 percent certain Guy was the man she saw in the liquor aisle with the silver revolver, who then tied her hands with duct tape and ordered her to kneel by the wall. She explained that the more she looked at Guy, the more she could "see that it was him."

At 2:30 a.m. on May 5, 2009, Murrieta Police Officer David Lawlor responded to a report of a robbery at the CVS store on Hancock Avenue, and met with Reinhardt and Bebik inside the store. Both women were very upset. After they calmed down, they each gave Officer Lawlor a statement concerning what had taken place and described the two robbers.

---

**5** When she was shown a photographic lineup two weeks after the robbery, Bebik circled Guy's photograph (photograph No. 1), and wrote below the photograph: "No. 1, maybe."

B.  *The Subsequent, Uncharged Encinitas CVS Robbery*

On May 16, 2009, Kyle Kenny was working a night shift at a CVS store in Encinitas.  Kenny was in the back of the store when he heard his coworker, Michael, calling repeatedly on the intercom for a manager to come to the front of the store.  Michael's voice sounded "a little shaken, little frightened," so Kenny went to the front of the store to see what was happening.

Before he got to the front of the store, Kenny stopped at the candy aisle and made eye contact with a tall man wearing a bandanna covering his face and a cowboy hat in an adjacent aisle.  As he turned the corner at the end of the candy aisle, the man confronted him with a silver revolver at his hip.  The man walked Kenny to the front of the store, asked Kenny whether he could open the safe, and Kenny told him he could not open the safe.

Before he got to the safe, Kenny saw Michael behind the counter on his knees with his hands duct taped together.  As he approached the safe, Kenny saw a second man escorting the pharmacist toward the front.  The second man was either Mexican or Black, wearing a black beanie with a bill and beige gardener's clothing (a "button-up") with reflective stripes.

Both robbers were "badgering" Kenny and the pharmacist to open the safe.  After Kenny and the pharmacist could not open the safe, the first robber walked the pharmacist to the back, while Kenny stayed behind the counter with the second man.  The second

6

man told Kenny not to look at him or he would be shot, and "just to act casual" if anyone walked into the store. Kenny complied and waited behind the counter.

A short time later, the two robbers walked Kenny to the back of the store, duct taped his hands, and made him sit with his coworkers on the stairs. The two robbers then left through the front door, but they came back inside almost immediately, and left through the emergency exit in the back of the store, which set off the alarms. A surveillance videotape of the robbery was played for the jury.

A sheriff's deputy who responded to the front of the store saw someone walk out the front door wearing a reflective coat (like a fireman's coat) and holding something against his chest. The deputy ordered the person to get down, heard something metallic hit the ground, then saw the person pick up the object and run back into the store. Another deputy who was watching the back of the store saw two suspects run out the back door and drive away in a black Mercedes Benz. Deputies pursued the car and it crashed at a nearby intersection. Guy was apprehended as he tried to flee from the crash site, but the other robber got away.

Shortly after the robbery, Kenny was taken to the crash site and identified Guy as the second robber, saying: "Yeah, that's definitely him. I'm positive it's him." At trial in late 2012, Kenny confirmed that his in-field identification of Guy was truthful, but explained he no longer recognized Guy as one of the robbers because the robbery had occurred some three and one-half years earlier. Kenny could not identify Humes in court as one of the robbers.

7

San Diego County Sheriff's Detective Michael Casey searched the crashed Mercedes Benz shortly after the robbery. Inside the glove compartment he found a wallet containing Humes's driver's license and $515 in cash. Also inside the car were a photograph of Humes with his young son, a title and insurance papers for the car in the name of Larry or Lawrence Humes, hats similar to those worn by the robbers of the Encinitas store, a white bandanna, duct tape, $389 in cash on the passenger floorboard, and a fully loaded silver .38-caliber revolver.

Detective Casey put Humes's Department of Motor Vehicles photograph into a six-pack photographic lineup. In the photograph, Humes's skin appeared darker than it is. A couple of days after the robbery, Detective Casey showed Kenny the six-pack photographic lineup, and Kenny responded: "Everybody in it is too dark." The detective then showed Kenny a single photograph of Humes with his young son that was found in the Mercedes Benz. Kenny told the detective he was 95 percent certain the man in the photograph with the boy was one of the robbers, and explained the man's beard, eyes, eyebrows, and cheeks were the same as the man who robbed him. The detective put the same photograph of Humes, without the boy in the picture, in a second six-pack photographic lineup, and Kenny again identified Humes.

The court took judicial notice that, on April 4, 2012, Guy was convicted of three counts of robbery, including the robbery of Kenny, based on the events at the CVS store in Encinitas on May 16, 2009. Guy was also convicted of the allegation he personally used a firearm in the robbery of Kenny. Humes was not tried for the Encinitas robbery.

8

C. *Evidence Presented Only to Humes's Jury*

On May 21, 2009, Humes and his girlfriend Donna McGlory were detained in Fontana by the San Bernardino County Sheriff's Department. A Murrieta police sergeant searched Humes and found $1,189 in cash in his front pocket and a hotel room key. The hotel room was in McGlory's name. According to McGlory, to rent a room at that hotel you had to have a driver's license, and Humes did not have his driver's license when they checked in.

When the police sergeant asked McGlory for permission to search the hotel room, Humes said anything found in the room belonged to him. McGlory had "a wad" of cash in her purse. She explained that Humes had given her the cash and had given her money on previous occasions. She claimed Humes sold cars, and on several occasions she had seen him lend his Mercedes Benz to Guy. The last time she saw the Mercedes Benz— about a week or two before May 21, 2009—it was with Guy.[6]

Murrieta Police Detective Andrew Spagnolo, the lead investigator on the robbery at the Murrieta CVS store, found a loaded Smith & Wesson .45-caliber chrome revolver inside the hotel room where Humes and McGlory were staying. Detective Spagnolo viewed the surveillance videotape from the Murrieta robbery, and testified he could see the individual in the blue shirt pull out a weapon, and in Detective Spagnolo's opinion,

---

[6] The Riverside County sheriff's deputy assigned to the courtroom during trial testified Humes was motioning to McGlory by nodding "yes" or shaking his head "no" when the prosecutor was questioning her, and she would answer the questions after Humes signaled her.

9

the weapon appeared to be a chrome revolver. His opinion was based on the appearance of the handle of the weapon in the videotape, and what appeared to be a cylinder "sticking out" of the robber's hand, rather than the "straight body of a semiauto[matic]" weapon. He could not say that the revolver found in Humes's Fontana hotel room was the revolver in the videotape, but the weapons shared the same characteristics. For purposes of the felon in possession of a firearm charge against Humes in count 6, the parties stipulated that Humes had a felony conviction prior to May 5, 2009.

D. *Guy's Custodial Statements to Police (Admitted Only to Guy's Jury)*

Detective Spagnolo interviewed Guy on May 22, 2009, and a recording of the interview was played for the jury. During the interview, Detective Spagnolo showed Guy a picture of Humes, and Guy said he knew Humes by the names Bobby and Larry. Guy admitted he and Humes committed the robbery at the Murrieta CVS store on May 5, 2009, along with a person named Jose, who acted as their getaway driver. Guy committed the robbery to repay a drug debt he owed Humes and because Humes threatened to kill him if he did not participate. Guy said Humes had a chrome revolver during the Murrieta robbery, but Guy denied he (Guy) had a gun. When Detective Spagnolo told Guy he knew Guy had a gun that night, Guy suggested he may have had an unloaded chrome revolver in his front pocket that Humes gave him just before the robbery. Guy did not testify or present any affirmative evidence.

10

E. *Humes's Defense Case*

Humes also did not testify, and his counsel argued he was mistakenly identified in both the Murrieta and Encinitas CVS robberies. He presented expert testimony from Dr. Robert Shomer concerning various psychological factors that may adversely affect the accuracy or reliability of eyewitness identifications. Humes also presented evidence he was in the business of buying and selling cars, and suggested that explained why he had a large amount of cash on his person, $1,189, when he was arrested in Fontana on May 22, 2009.

III. DISCUSSION

A. *The Evidence of the Encinitas Robbery Was Properly Admitted*

Each defendant claims the trial court abused its discretion under Evidence Code sections 352 and 1101, subdivision (b), and deprived them of their due process rights to a fair trial, in admitting the evidence of their involvement in the Encinitas robbery on May 16, 2009, 11 days after the May 5, 2009, charged robberies of the Murrieta CVS store clerks. We conclude the other crimes or uncharged acts evidence was properly admitted against each defendant.

1. Relevant Background

The prosecutor moved in limine to admit the evidence of defendants' involvement in the Encinitas robbery, arguing it was relevant to prove each defendant's identity and intent in committing the Murrieta robbery, among other factual issues. Following a lengthy discussion of the admissibility of the evidence, the trial court ruled, over each

11

defense counsel's objection, that the evidence was admissible on the issues of each defendant's identity and intent in committing the Murrieta robbery.

Each jury was instructed that it could consider the evidence of the uncharged acts, "only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged acts," and, if it decided the defendant committed the uncharged acts, it could, but was not required to, consider the evidence "for the limited purpose" of deciding whether each defendant "was the person who committed the offenses alleged in this case; or [¶] The defendant acted with the intent necessary to commit Robbery . . . ." (CALCRIM No. 375.) Each jury was further instructed not to conclude from the evidence that defendant had a bad character or was disposed to commit crime, and to consider the "similarity or lack of similarity between the uncharged acts and the charged offenses" in evaluating the evidence.

Humes's jury was additionally instructed not to consider the evidence for any purpose other than Humes's identity and intent. Guy's jury was instructed not to consider the evidence "for any other purpose [other than Guy's identity and intent] except for the limited purpose of determining the credibility of the defendant and determining whether or not he acted under duress." This particular instruction to Guy's jury recognized that Guy admitted his involvement in the Encinitas robbery during his May 22, 2009, police interview, but claimed he did so under duress because he owed a drug debt to Humes and Humes threatened to kill him if he did not participate. Finally, each jury was instructed that in the event it concluded the defendant committed the Encinitas

12

robbery, that conclusion was "only one factor to consider along with all the other evidence," and was "not sufficient by itself to prove" that defendant was guilty of the charged offenses. The People still had to prove each charge and allegation beyond a reasonable doubt.

2. Analysis

Under subdivision (a) of Evidence Code section 1101, evidence that a defendant committed a crime other than the charged crime is inadmissible to prove the defendant's disposition to commit crimes, or "conduct on a specified occasion."[7] Subdivision (b) of Evidence Code section 1101 clarifies, however, that subdivision (a) does not prohibit the admission of other crimes evidence when the evidence is relevant to prove "some fact" other than the defendant's criminal disposition or character, "such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . . ." (*People v. Edwards* (2013) 57 Cal.4th 658, 711.)

For other crimes evidence to be relevant on the issue of the defendant's identity as the perpetrator of the charged crime, "the uncharged misconduct and the charged offense must share common features that are sufficiently distinctive so as to support the inference that the same person committed both acts. [Citation.] 'The pattern and characteristics of

---

**7** Evidence Code section 1101, subdivision (a) provides: "Except as provided in this section . . . evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion."

the crimes must be so unusual and distinctive as to be like a signature.' [Citation.]" (*People v. Ewoldt* (1994) 7 Cal.4th 380, 403 (*Ewoldt*).)

Still, "[t]he inference of identity . . . 'need not depend on one or more unique or nearly unique common features; features of substantial but lesser distinctiveness may yield a distinctive combination when considered together.' [Citation.]" (*People v. Lynch* (2010) 50 Cal.4th 693, 736, quoting *People v. Miller* (1990) 50 Cal.3d 954, 987.) Indeed, "'[o]ther-crimes evidence is admissible to prove the defendant's identity as the perpetrator of another alleged offense on the basis of similarity "when the marks common to the charged and uncharged offenses, considered singly or in combination, logically operate to set the charged and uncharged offenses apart from other crimes of the same generally variety and, in so doing, tend to suggest that the perpetrator of the uncharged offenses was the perpetrator of the charged offenses." [Citation.]'" (*People v. Miller, supra,* at p. 987.)

Other crimes evidence is relevant to prove intent "so long as (1) the evidence is sufficient to sustain a finding that the defendant committed both sets of crimes [citations], and further (2) . . . 'the factual similarities among the [charged and uncharged crimes] tend to demonstrate that in each instance the perpetrator harbored' the requisite intent." (*People v. Soper* (2009) 45 Cal.4th 759, 778.) As explained in *Ewoldt*: "In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar [to the charged conduct] to support the inference that the defendant "'probably harbor[ed] the

14

same intent in each instance." [Citations.]' [Citation.]" (*Ewoldt, supra,* 7 Cal.4th at p. 402.)

Even if other crimes evidence is relevant to prove identity, intent, or any fact other than the defendant's criminal disposition or character, it is subject to exclusion under Evidence Code section 352 if its probative value is substantially outweighed by the probability its admission will result in undue prejudice, confusion of the issues, or will mislead the jury. (*Ewoldt, supra,* 7 Cal.4th at 404.) We review the court's rulings under Evidence Code sections 1101, subdivision (b) and 352 for an abuse of discretion (*People v. Foster* (2010) 50 Cal.4th 1301, 1328), and view the evidence in the light most favorable to the court's ruling (*People v. Edwards, supra,* 57 Cal.4th at p. 711). An abuse of discretion occurs when the court's ruling "'falls outside the bounds of reason.'" (*People v. Kipp* (1998) 18 Cal.4th 349, 371.)

Here, the uncharged Encinitas robbery was sufficiently similar to the Murrieta robbery to establish the identity of each defendant as the perpetrators of the Murrieta robbery, and their intent to rob the two clerks in the Murrieta CVS store. As the trial court pointed out, both robberies were committed at 24-hour CVS stores near freeways, in the wee hours of the morning, only 11 days apart. Also in each case, the perpetrators used chrome or silver revolvers, went after money in both the cash registers and the safe, used duct tape to bind the wrists of all of the victims, and placed the victims in the rear area of the stores. These similarities or common marks were so numerous, and the robberies occurred so close together in time, that the similarities ""logically operate[d]

15

to set the charged and uncharged offenses apart from other crimes of the same general variety and, in so doing, tend[ed] to suggest that the perpetrator of the uncharged offenses was the perpetrator of the charged offenses."'" (*People v. Miller, supra,* 50 Cal.3d at p. 987.)

As the trial court also pointed out, each defendant was identified by at least one of the victims in each case, before trial in the present case. Kenny identified Guy as a perpetrator in the Encinitas robbery at the in-field show up immediately after that robbery, and Reinhardt identified Humes as one of the perpetrators of the Murrieta robbery on May 19, 14 days after the Murrieta robbery.[8] Furthermore, Guy was apprehended when he attempted to flee from Humes's crashed black Mercedes Benz after the Encinitas robbery, and Humes's wallet and other belongings were found in the Mercedes Benz, strongly indicating he was the other robber in the Encinitas robbery. The striking similarities between the Encinitas and Murrieta robberies were also relevant to the credibility of Guy's claim that he acted under duress when he committed the Murrieta robbery.[9]

---

[8] As the court explained in admitting the evidence of the Encinitas robbery on the issues of each defendant's identity: "What pushes me over the edge is both Mr. Humes and Mr. Guy are identified by at least one of the victims in each case. It's that that makes it a signature, because human beings are unique. Mr. Guy is a unique person in the case of Mr. Humes."

[9] Guy notes in passing that the evidence of the Encinitas robbery was inadmissible to undermine the credibility of his claim he acted under duress in committing each of the robberies, but he provides no argument or authority to support this claim, and we agree with the People that it is forfeited. (*Nelson v. Avondale Homeowners Assn.* (2009) 172 Cal.App.4th 857, 862 [Fourth Dist., Div. Two].) In any event, the claim lacks merit. The evidence that Guy committed the Murrieta robbery 11

*[footnote continued on next page]*

16

Humes's reliance on *People v. Rivera* (1985) 41 Cal.3d 388 is unavailing.  In that case, it was error to admit evidence of a prior robbery of a convenience store on the issue of the defendant's identity as a perpetrator of a convenience store burglary in which a customer was stabbed and killed, and which occurred around 18 months after the robbery, because the similarities between the prior and charged crimes were too general, and "not sufficiently unique or distinctive" to amount to a "'signature' or other indication" that the defendant perpetrated both crimes.  (*Id*. at pp. 392-393.)

To be sure, the prior robbery and charged crimes shared some general similarities: each involved convenience stores located on street corners in Rialto; both crimes occurred on a Friday night around 11:30 p.m.; both involved getaway vehicles and three perpetrators; prior to each crime, two or three people were observed standing outside the stores; and the defendant used an alibi defense in both crimes.  (*People v. Rivera, supra,* 41 Cal.3d at pp. 392-393.)  But as the court explained, the dissimilarities between the prior robbery and the charged crimes were significant:  for example, the prior robbery was an armed robbery, but the charged offense was a "'snatch' burglary plus a stabbing" and no guns were used; money was taken in the robbery, but only beer was taken in the burglary.  (*Id*. at p. 393.)  In holding it was error to admit the evidence of the prior robbery, the court pointed out that convenience stores are often on street corners and are

*[footnote continued from previous page]*
days before the Encinitas robbery, without having contacted the police in the interim, undermined the credibility of his claim that he acted under duress when he committed the Murrieta robbery.  (Evid. Code, § 1101, subd. (c) [nothing in Evid. Code, § 1101 affects the admissibility of evidence offered to attack the credibility of a witness].)

"prime targets" for crimes; many offenses occur on Friday nights, involve getaway cars, and more than one perpetrator. (*Ibid*.) Here, in contrast, the Encinitas and Murrieta robberies shared *distinctive* similarities; each involved CVS stores in the early morning hours, and occurred only 11 days apart; each defendant was identified as one of the perpetrators in both crimes; and other circumstantial evidence showed each defendant was involved in each crime.

Humes argues that even if the evidence of the Encinitas robbery was relevant to prove his identity as a perpetrator of the Murrieta robbery (Evid. Code, § 1101, subd. (b)), it nonetheless should have been excluded under Evidence Code section 352 because it was more prejudicial than probative. Not so. Other crimes evidence carries an inherent risk of prejudice, and its admission therefore requires "extremely careful analysis." (*Ewoldt, supra,* 7 Cal.4th at p. 404.) But here, the court reasonably concluded that the probative value of the evidence of the Encinitas robbery on the issue of each defendant's identity outweighed its potential prejudicial effect. Indeed, the evidence of the Encinitas robbery was no more inflammatory than the evidence of the Murrieta robbery. (*Id*. at p. 405 [potential for prejudice decreased when evidence of uncharged crimes no more inflammatory than evidence of charged crimes].)

Additionally, the juries were instructed to consider the evidence of the Encinitas robbery for limited purposes: on the issues of each defendant's identity and intent in committing the Murrieta robbery, and in the case of Guy, the credibility of his defense that he acted under duress in committing *both* robberies. (*People v. Barnett* (1998) 17

18

Cal.4th 1044, 1119 [limiting instructions minimized any danger the jury used other crimes evidence for improper purpose].)  Finally, the juries heard Guy had already been convicted of the Encinitas robbery, further reducing any prejudicial effect admitting the evidence of the Encinitas robbery may have had against Guy.  (*People v. Balcom* (1994) 7 Cal.4th 414, 427 [when jury knows the defendant was convicted of uncharged crime, it is less likely to convict the defendant of the charged crime as punishment for uncharged crime].)

Defendants argue the admission of the Encinitas robbery to establish their criminal intent in committing the Murrieta robbery was improper under Evidence Code section 352, because their intent was not in dispute.  Not so.  First, defendants' not guilty pleas put each element of the Murrieta robbery in issue, including defendants' intent in committing the robberies.  (See *People v. Carpenter* (1997) 15 Cal.4th 312, 379.)  Also, Guy claimed he acted under duress in committing the Murrieta robbery, and this made the evidence that he perpetrated the Encinitas robbery—only 11 days after the Murrieta robbery and without contacting the police to report that Humes threatened to kill him if he did not participate—highly probative of his criminal intent in committing the Murrieta robbery.  (*People v. Petznick* (2003) 114 Cal.App.4th 663, 675-676 ["defense of duress negates the intent . . . to commit the crime charged."].)  Moreover, and as discussed, the evidence of the Encinitas robbery was highly probative of each defendant's identity as a perpetrator of the Murrieta robbery, and this negated any prejudice that may have resulted from admitting the evidence on the additional issue of defendants' intent.  (See *People v.*

19

*Gray* (2005) 37 Cal.4th 168, 204 [admission of prior crimes evidence on issue of the defendant's intent to rape and sodomize victim harmless under any standard because the same evidence was properly admitted on the issues of identity and intent to kill, and ample circumstantial evidence showed the defendant intended to rape and sodomize the victim].)

Lastly, the admission of the evidence of the Encinitas robbery did not render the trial fundamentally unfair, or violate either defendant's due process rights. (*Estelle v. McGuire* (1991) 502 U.S. 62, 70; *People v. Partida* (2005) 37 Cal.4th 428, 439 ["[T]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*."]; *People v. Falsetta* (1999) 21 Cal.4th 903, 913 ["The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair."].) As explained, the other crimes evidence was highly probative of whether defendants perpetrated the Murrieta robbery, and was properly admitted. We discern no fundamental unfairness to defendants in its admission.

B. *The Evidence of Kenny's Pretrial Identification of Humes as One of the Encinitas Robbers Was Properly Admitted*

Humes claims the court committed federal constitutional error in admitting the evidence of Kenny's pretrial identification of him as one of the Encinitas robbers; exacerbated the error in allowing the prosecutor to treat Kenny as a hostile witness; and gave jury instructions that favored the prosecution. Humes argues that Kenny's pretrial

identification of him should have been excluded because it was unduly suggestive and unreliable. Thus, he argues, its admission therefore violated his due process rights to a fair trial.

As we explain, the evidence of Kenny's pretrial identification of Humes as one of the Encinitas robbers was properly admitted. Though, as the court concluded, Kenny's identification of Humes was suggestive, or even unduly suggestive, it was nevertheless reliable under the totality of the circumstances. Thus, the jury was properly allowed to consider the evidence.

1. Relevant Background

As indicated, Kenny testified at trial that he did not recognize Humes as one of the Encinitas robbers. Detective Casey then testified that a couple of days after the Encinitas robbery, he showed Kenny a six-pack photographic lineup, including Humes's Department of Motor Vehicles photograph, and Kenny responded: "Everybody in it is too dark." Detective Casey then showed Kenny a single photograph of Humes with his young son that was found inside Humes's crashed Mercedes Benz shortly after the Encinitas robbery.

Kenny told Detective Casey he was 95 percent certain the man in the photograph with the boy was one of the robbers, and explained the man's beard, eyes, eyebrows, and cheeks were the same as the man who robbed him. Detective Casey then put the same photograph of Humes, without the boy, in a second six-pack photographic lineup, and

21

Kenny again identified Humes, saying: "I already identified the guy. You already showed me the picture."

Following this testimony, the court told counsel outside the presence of the jury that it was "seriously concerned" about the suggestiveness of the identification procedure with Kenny, and would consider a motion to strike the identification evidence. Humes's counsel promptly moved to strike the evidence, and the prosecutor objected, arguing Kenny's identification was properly based on the single photograph of Humes. After further discussion, the court denied the motion to strike, finding that even though the identification procedure with Kenny was suggestive, it was nevertheless reliable under the totality of the circumstances.

2. Analysis

"In order to determine whether the admission of identification evidence violates a defendant's right to due process of law, we consider (1) whether the identification procedure was unduly suggestive[10] and unnecessary, and, if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated

_____

**10** "[A]n identification procedure is considered *suggestive* if it 'caused defendant to "stand out" from the others in a way that would suggest the witness should select him.' [Citation.]" (*People v. Cook* (2007) 40 Cal.4th 1334, 1355, italics added; quoting *People v. Carpenter, supra,* 15 Cal.4th at p. 367.)

at the time of the identification, and the lapse of time between the offense and the identification. [Citations.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 989.) "'The defendant bears the burden of demonstrating the existence of an unreliable identification procedure.'" (*People v. Gonzalez* (2006) 38 Cal.4th 932, 942.) There must be a "substantial likelihood of irreparable misidentification" under the ""'totality of the circumstances'"" to warrant reversal of a conviction on the ground of an unduly suggestive identification procedure. (*Manson v. Brathwaite* (1977) 432 U.S. 98, 104-107; *People v. Cunningham, supra,* at p. 990.) We independently review a trial court's ruling that an identification procedure was unduly suggestive and, if so, whether it was nonetheless reliable under the totality of the circumstances. (*People v. Kennedy* (2005) 36 Cal.4th 595, 608-609.)

We agree with the trial court that even if the pretrial identification procedure that Detective Casey used with Kenny was suggestive, or even *unduly* suggestive, it was nonetheless reliable under the totality of the circumstances. Indeed, numerous factors support the reliability of Kenny's identification of Humes as one of the Encinitas robbers, even though he identified Humes from the single photograph of him with his son.

First, the surveillance videotape of the Encinitas robbery showed Kenny had several opportunities to view Humes during the robbery; Humes had nothing covering his face; and Kenny spoke to Humes during the robbery. Kenny also gave a sheriff's deputy a detailed description of Humes shortly after the robbery, and his description was corroborated by other evidence. Kenny said Humes was wearing a black beanie with a

23

bill and a beige "button-up" jacket with reflective stripes. Inside the crashed Mercedes Benz, officers found a baseball hat inside a dark blue beanie, and the officer who responded to the front of the store saw one of the perpetrators walk outside the store wearing a "fireman's type coat" with reflective qualities.

Kenny described Humes as having wrinkled skin on both cheeks, and in closing argument, the prosecutor pointed out that Humes had wrinkled cheeks. Kenny estimated the second suspect was six feet three inches tall and weighed 200 pounds; Humes's Department of Motor Vehicles photograph indicated he was six feet two inches tall and weighed 195 pounds. Kenny was also very certain of his identification of Humes: he said he was 95 percent certain Humes was one of the robbers when shown the single photograph of Humes with his son, and explained that the cut of the beard, the eyes, eyebrows, and cheeks of the man in the photograph were the same as the man who robbed him. Finally, only one or two days passed between the Encinitas robbery and Kenny's identification of Humes from the single photograph.

For all of these reasons, the admission of Kenny's pretrial identification of Humes was proper and did not violate Humes's due process rights. There is no "'substantial likelihood of irreparable misidentification'" under the "'"'totality of the circumstances'"'"" to warrant reversal of Humes's convictions on the ground of an unduly

24

suggestive identification procedure.  (*People v. Cunningham, supra,* 25 Cal.4th at p.

990.)[11]

---

[11] Nor is there any merit to Humes's suggestion that allowing the prosecutor to treat Kenny as a hostile witness (Evid. Code, § 767) affected the reliability of Kenny's pretrial identification of Humes, or in any way prejudiced Humes.  The trial court had broad discretion to allow the prosecutor to treat Kenny as a hostile witness (*People v. Williams* (2008) 43 Cal.4th 584, 631) and did not abuse that discretion here.  As the People point out, in testifying on direct examination, Kenny contradicted statements he gave prior to trial and appeared unwilling to recall things he reasonably should have recalled.  And when asked whether he wanted to be testifying, Kenny responded, "No. Hell no," and explained:  "The whole thing is irritating, and I have a job interview that was postponed."  Kenny admitted he was "[q]uite a bit" upset that he had to testify and it was "the last thing" he wanted to do.  Humes has not explained how the prosecutor's treatment of Kenny as a hostile witness, by asking him leading questions, resulted in the admission of any evidence that would not have otherwise been admitted.

Humes also complains that the prejudicial nature of Kenny's pretrial identification of him was exacerbated because the trial court instructed pursuant to CALCRIM Nos. 105 and 226 that:  "If you do not believe a witness's testimony that he or she no longer remembers something, that testimony is inconsistent with the witness's earlier statement on that subject."  He argues these standard instructions "added to the prejudice" because they corroborated Reinhardt's in-court identification of Humes as one of the Murrieta robbers, and "assisted the state in undermining Kenny's testimony at trial . . . ."  (In closing argument, the prosecutor argued Kenny was "basically useless on the stand.")

This argument is specious.  The prosecution properly sought to discredit Kenny's trial testimony that he no longer recognized Humes, and paint Kenny as a hostile witness who did not want to cooperate with the prosecution.  The instructions merely informed the jury of the numerous factors it could consider in evaluating a witness's credibility, without instructing it whether to credit or discredit Kenny's trial testimony.  Indeed, the same instructions also told the jury:  "Do not automatically reject testimony just because of inconsistencies or conflicts.  Consider whether the differences are important or not. People sometimes honestly forget things or make mistakes about what they remember. . . ."

Finally, Humes suggests the prejudice from Kenny's pretrial identification of him was further exacerbated because Humes's jury was told Humes was not prosecuted for the Encinitas robbery, though it was also informed that Guy was convicted of three counts of robbery and the personal use of a firearm based on the Encinitas robbery.  But as the People point out, Humes's counsel, not the prosecutor, clarified that Humes was not convicted in the Encinitas robbery, apparently so counsel could argue that Humes was mistakenly identified as being involved in the Encinitas robbery, as well as in the

*[footnote continued on next page]*

C. *The Opinion Testimony By Detective Spagnolo Was Properly Admitted, and the*

*Erroneous Admission of Detective Casey's Opinion Testimony Was Harmless*

Humes claims the court erroneously allowed the prosecutor to elicit improper *lay* opinion testimony from Detectives Spagnolo and Casey, over his objections.  We find no merit to either of these claims.

    1.  Analysis of Detective Spagnolo's Opinion Testimony

Over defense counsel's objection that it constituted improper lay opinion testimony, Detective Spagnolo testified that, after he reviewed the surveillance videotape of the Murrieta robbery, the gun the suspect wearing the blue shirt pulled from his pocket or waistband in the videotape looked like a chrome revolver, rather than a semiautomatic. He said the gun in the videotape shared some of the same characteristics as the gun he found in Humes's hotel room on May 22, 2009, three days after the Encinitas robbery, specifically, the "[c]urvature of the frame from the handle and the protruding of the cylinder, and the chrome finish."  He could not say, however, that the gun found in the hotel room was *the same gun* held by the suspect in the surveillance videotape of the Murrieta robbery.

Humes claims Detective Spagnolo's testimony "usurped the jury's role as triers of fact, resulting in prejudice that no limiting instruction could cure, thereby depriving [him]

_____

*[footnote continued from previous page]*
Murrieta robbery.  Humes should not be heard to complain of any prejudice resulting from his trial counsel's reasonable, strategic decision to take advantage of the fact Humes had not been convicted of the Encinitas robbery.

of due process and a fair trial."  We disagree.  The testimony was properly admitted as *expert* opinion testimony.

"'California law allows expert testimony that is related "to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact."'  [Citations.]"  (*People v. Spence* (2012) 212 Cal.App.4th 478, 507; Evid. Code, § 801, subd. (a).)  An expert's opinion must be "[b]ased on matter (including [the expert's] special knowledge, skill, experience, training, and education) perceived by or personally known to the [expert] or made known to him [or her] at or before the hearing . . . ."  (Evid. Code, § 801, subd. (b).)

As Humes points out, lay opinion "plays a very different role than expert opinion and is subject to different rules of admissibility.  '"Lay opinion testimony is admissible where no particular scientific knowledge is required, or as 'a matter of practical necessity when the matters . . . observed are too complex or too subtle to enable [the witness] accurately to convey them to the court or jury in any other manner.'  [Citations.]" [Citation.]'  [Citation.]"  (*People v. Chapple* (2006) 138 Cal.App.4th 540, 547.)[12]

We agree with Humes that Detective Spagnolo's opinion testimony was not lay opinion testimony.  It was, however, properly admitted as expert opinion, because it was based on the detective's special knowledge, skill, expertise, and training with firearms. (Evid. Code, § 801, subd. (b).)  Indeed, in addressing defense counsel's objection to

---

[12] "A lay witness may testify to an opinion if it is rationally based on the witness's perception and if it is helpful to a clear understanding of [the witness's] testimony.  (Evid. Code, § 800.)"  (*People v. Farnam* (2002) 28 Cal.4th 107, 153.)

27

Detective Spagnolo's testimony, the court ruled it would allow the detective to offer the testimony, provided the prosecutor "establish[ed] the proper foundation that he not only knows the difference between a revolver and a semiautomatic but that he has some expertise in firearms such that he would be a person who has a sufficient expertise to assist the jury." This foundation was subsequently laid.

Before he offered his opinion, Detective Spagnolo testified he was familiar with firearms and knew the difference in appearance between revolvers and semiautomatics. During his 18-year career as a law enforcement officer, he carried a revolver for two years and a semiautomatic for 16 years. In order to carry the firearms, he had to be "qualif[ied]" with them, meaning he had to show he could manipulate, fire, reload, and clean them. He then described the difference between revolvers and semiautomatics, and offered his opinion that the *gun* used by the blue-shirted robber in the surveillance videotape of the Murrieta robbery appeared to be a chrome revolver, and shared many of the same characteristics as the revolver he found in Humes's hotel room.

The trial court did not abuse its discretion in allowing Detective Spagnolo's testimony. (*People v. Lindberg* (2008) 45 Cal.4th 1, 45 [admission of expert testimony reviewed for abuse of discretion].) As his testimony showed, Detective Spagnolo has specialized knowledge of firearms such that his opinion assisted the jury in determining whether the gun used by the blue-shirted robber in the surveillance videotape of the Murrieta robbery, and the chrome revolver Detective Spagnolo found in defendant's hotel room, were the same gun and, therefore, whether Humes was the blue-shirted robber in

the surveillance videotape of the Murrieta robbery. In sum, the testimony was properly admitted as expert opinion testimony.

Humes points out he "does not challenge [Detective] Spagnolo's knowledge of firearms, only his ability to testify to matters that the jurors could determine for themselves by looking at the evidence . . . ." But Humes's assertion that the jurors were independently capable of determining whether the two guns were one and the same disregards the unfamiliarity most laypersons have with guns, and with distinguishing revolvers from semiautomatics. Indeed, Reinhardt testified she was unfamiliar with guns, and she could not say whether the gun Humes used to rob her was a revolver or a semiautomatic. As the People point out, whether a particular gun is a revolver or a semiautomatic is a matter sufficiently beyond common experience such that Detective Spagnolo's opinion on the matter assisted the trier of fact.

2. Analysis of Detective Casey's Opinion Testimony

Detective Casey testified that Kenny identified Humes "within a minute" or "fairly quickly" after Detective Casey showed him the single photograph of Humes with his young son. The prosecutor next asked whether Kenny's "reaction" when shown the photograph was "within the normal range of successful identifications," in terms of the time it took Kenny to identify Humes, and Detective Casey answered "[y]es."

On cross-examination, the defense asked Detective Casey whether he suspected Humes was the second person involved in the Encinitas robbery when he showed Kenny the single photograph of Humes. The detective answered: "Oh, of course. I saw him

29

[Humes] on the video at the CVS Pharmacy during the robbery." The detective explained he had also seen Humes's driver's license, but he had never seen Humes in person before he saw the surveillance videotape or photographs.

Detective Casey then testified: "And I saw the person with the gun inside the [Encinitas] CVS Pharmacy robbing . . . the three people." Defense counsel objected and moved to strike this testimony as improper lay opinion testimony, and the objection was overruled. Counsel then asked Detective Casey "[w]hat part of Mr. Humes'[s] face" he had seen on the videotape, and Detective Casey responded he saw "portions of all his face," including "his nose, his mouth" and "his chin," and "[h]e was wearing that hat. He had a large chin. His—you could see a bit of a mustache stubble. You could see his nose. It's like he looks today, only three years older." He also saw Guy on the videotape.

At side bar, the defense again asked the court to strike the detective's testimony that Humes and Guy were the robbers seen on the videotape, as improper lay opinion. The court again overruled the objection, saying the detective's opinion was "well within the realm of lay opinion."

Later during trial, defense counsel asked the court to reconsider its ruling and strike the testimony. Following further discussion of the matter, and an Evidence Code section 402 hearing during which Detective Casey said he had not seen *Guy* before he saw him on the videotape (the detective already testified he had not seen Humes before he saw his photographs and the videotape), the court reversed itself and instructed the

30

jury to disregard Detective Casey's testimony that Humes *and* Guy were the men seen on the videotape. The court struck Detective Casey's testimony because he had not personally seen Humes or Guy before he saw them in the surveillance videotape.[13]

The court instructed the jury: "Detective Casey made an identification . . . that the person in the surveillance video or persons in the surveillance video at the CVS were the same as the picture obtained from the car and same with Mr. Humes and Mr. Guy. I'll ask you to disregard that identification for the following reasons: [¶] Normally, identification is a matter of lay opinion. Since it's based on surveillance video or photos, you, the jurors, can make that comparison and make your own decision. Opinion, whether lay opinion or expert opinion, is designed to help the jurors with something they can't do or do not have on their own, whether expertise or personal knowledge. Since you on your own can make that comparison, it's up to you to make that comparison. That's the only reason why I'm going to ask you to disregard that."

Though the jury was instructed to disregard it, Humes argues Detective Casey's opinion testimony nonetheless "usurped the jury's role as triers of fact, resulting in prejudice that no limiting instruction could cure, thereby depriving [him] of due process and a fair trial." Not so. Jurors are presumed to follow the court's instructions, including

---

**13** As the trial court recognized, two conditions must be present before a witness may offer a lay opinion of the *identity of a person* depicted in a surveillance videotape or photograph: (1) the witness must testify from *personal knowledge* of the person's appearance at or before the time the videotape or photograph was taken, and (2) the testimony must *aid the trier of fact* in determining the identity of the person in the videotape or photograph. (*People v. Mixon* (1982) 129 Cal.App.3d 118, 128; *People v. Perry* (1976) 60 Cal.App.3d 608, 614-615.) Here, the first condition was not present.

31

instructions to disregard evidence.  (*People v. Avila* (2006) 38 Cal.4th 491, 574.)  And here, there is no reason to believe the jury did not follow the instruction to disregard Detective Casey's opinion that Humes and Guy were the two robbers seen in the videotape of the Encinitas robbery.

Humes relies on *Bruton v. United States* (1968) 391 U.S. 123, 135 where the high court said:  "[T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored."  But this is not such a context.  *Bruton* was referring to the use of "powerfully incriminating extrajudicial statements of a codefendant" on trial "side-by-side" with the defendant, implicating the defendant in a crime.  (*Id*. at pp. 135-136.)  As *Bruton* explained, not only are such statements "devastating to the defendant but their credibility is inevitably suspect . . . ."  (*Id*. at p. 136.)  But here, Detective Casey's stricken testimony that Humes and Guy were the men in the videotape was not powerfully incriminating in view of a plethora of other evidence implicating both men in the Encinitas *and* Murrieta robberies.  In striking the testimony and instructing Humes's jury to disregard it, the court explained to the Humes's jury that it was just as capable as Detective Casey to view the videotape of the Murrieta robbery and determine, based on all of the evidence, whether Humes was the robber in the videotape.

In any event, the error in admitting the testimony was harmless.  (*People v. Watson* (1956) 46 Cal.2d 818, 836.)  It is not reasonably probable that either defendant

32

would have realized a more favorable result had the juries not heard Detective Casey's opinion testimony. The evidence of Humes's and Guy's identities as the Murrieta robbers was ample, even overwhelming. After the Encinitas robbery, two people ran outside the Encinitas CVS store and got into a black Mercedes Benz. Following a police pursuit, the Mercedes Benz crashed, and Guy was arrested as he attempted to flee from the crash. Inside the Mercedes Benz, which was registered to Humes, officers found numerous items apparently belonging to Humes, including his wallet, his driver's license, insurance documents in Humes's name, and a photograph of him with his son. Shortly thereafter, Kenny identified Humes as one of the robbers from the photograph, saying he was 95 percent sure the man in the photograph was one of the robbers.

Further, Reinhardt was very certain of both her pretrial and in-court identifications of Humes as the first robber who walked into the Murrieta CVS store. And when Humes was arrested in Fontana on May 22, 2009, he had $1,189 in cash in his pocket, and his girlfriend, McGlory, had "a wad" of cash he had given her. Humes also had a loaded chrome revolver in his motel room that matched the descriptions of one of the guns used in both robberies.

D. *Humes Has Not Established Ineffective Assistance of His Trial Counsel*

Humes claims his counsel rendered ineffective assistance in failing to object to (1) Detective Casey's testimony that Kenny's pretrial identification of Humes was within the range of successful identifications, and (2) the prosecutor's rebuttal argument that Dr. Shomer could not tell the jury anything specific about this case because he was not

33

present during the Murrieta robbery. As we explain, Humes has not demonstrated either deficient performance or resulting prejudice.

"'. . . "In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome. [Citations.] A reviewing court will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy. Defendant thus bears the burden of establishing constitutionally inadequate assistance of counsel. [Citations.]"' [Citations.]" (*People v. Brown* (2014) 59 Cal.4th 86, 109; see *Strickland v. Washington* (1984) 466 U.S. 668, 694.)

Humes argues his counsel's failure to object to Detective Casey's testimony that Kenny's pretrial identification of Humes was "within the range of successful identifications," was deficient because the testimony lacked foundation and constituted an improper opinion. But as the People point out, counsel's failure to object to the testimony may have been a tactical decision not to call attention to the minor point. Humes has not shown otherwise. And for the reasons discussed, Kenny's pretrial identification of Humes was properly admitted because it was reliable under the totality of the circumstances. Detective Casey's minor comment that Kenny's pretrial identification was "within the range of successful identifications" bordered on the

34

superfluous, given the many reasons Kenny's identification was reliable. Thus, Humes has not shown prejudice as a result of this alleged deficiency in his trial counsel's performance. It is not reasonably probable Humes would have realized a more favorable result had the objection been made and the testimony excluded.

In rebuttal argument, the prosecutor discussed the defense witness who testified that he knew Humes bought and sold cars, but he had never seen Humes with large amounts of cash on his person, or "with more than lunch money." The prosecutor argued the witness did nothing for Humes's defense case. Then the prosecutor turned to Dr. Shomer, the defense witness who testified about factors affecting the accuracy or reliability of eyewitness identifications, saying: "Even Shomer said the same thing. 'I can't tell you anything about this case. Anything, specifically.' He talked generalities. He has no idea because he wasn't there." Humes's trial counsel did not object. Later, the prosecutor again argued without objection: "[C]ounsel claimed that I didn't rebut Shomer. It's because it was so obvious he was biased and [had] an interest. I don't need to. Plus, he even admitted, 'I can't tell you anything about this case.'"

Before Dr. Shomer testified, the court ruled he could not talk about the specifics of the case, including whether Reinhardt's, Kenny's, or any other witness's identifications were reliable. In cross-examining Dr. Shomer, the prosecutor asked: "Okay. So the bottom line, after coming in here, 35 years in the field, hundreds of thousands of dollars [in expert witness fees] later, studies which you haven't published in over 15 years, you really can't tell us anything about this case and what really happened here?" Humes's

35

counsel objected on the ground the question was "argumentative and improper," and the objection was sustained. At side bar, the court reminded the prosecutor it had limited Dr. Shomer's testimony to the factors affecting the reliability of eyewitness testimony, and ruled he could not render an opinion about "what happened in this case." The court asked the prosecutor whether he understood, and the prosecutor responded, "[y]es." With that, the prosecutor had no further questions of Dr. Shomer.

Humes's trial counsel's failure to object to the prosecutor's rebuttal argument regarding Dr. Shomer was apparently a reasonable tactical decision. Indeed, objecting to the prosecutor's rebuttal argument was completely unnecessary. During his own closing argument, Humes's trial counsel argued at length that all of the identifications of Humes were unreliable, for many of the reasons Dr. Shomer testified, that all eyewitness identifications are generally unreliable: for example, the crime victims were under stress and did not have an opportunity to see the robbers clearly. Counsel also pointed out there was no physical or corroborating evidence tying Humes to the Murrieta or Encinitas robberies.

Given trial counsel's argument emphasizing the relevancy and importance of Dr. Shomer's testimony, it was reasonable for him not to object when the prosecutor pointed out that Dr. Shomer's testimony was general, and did not address whether any of the identifications in the present case were reliable. Further, Humes has not demonstrated resulting prejudice. For the reasons discussed, the evidence that Humes committed the Murrieta robbery was ample, even overwhelming.

36

E.  *Substantial Evidence Supports Humes's Robbery and False Imprisonment*

*Convictions*

Humes claims insufficient evidence supports his convictions for robbing and falsely imprisoning Reinhardt and Bebik in counts 2 through 5.  Even though Reinhardt positively identified Humes as one of the perpetrators in the robbery and false imprisonments both in court and shortly after the crimes occurred, Humes argues Reinhardt's identification "falls short of carrying enough persuasive force as to constitute substantial, credible evidence," and her "unreliable identification testimony was propped up by [the] inadmissible 'other crimes' evidence" of the Encinitas robbery and the "inadmissible . . . pretrial identification testimony of Kenny . . . ."  We conclude substantial evidence supports the convictions.

In reviewing a challenge to the sufficiency of the evidence supporting a criminal conviction, the applicable standard of review is well settled.  We review the entire record in the light most favorable to the judgment and determine whether it contains substantial evidence—evidence that is reasonable, credible, and of solid value—upon which a rational trier of fact could have found the defendant guilty of the crime beyond a reasonable doubt.  (*People v. Johnson* (1980) 26 Cal.3d 557, 578; *Jackson v. Virginia* (1979) 443 U.S. 307, 319.)  We presume in favor of the judgment every fact the trier of fact could have reasonably deduced from the evidence.  (*People v. Crittenden* (1994) 9 Cal.4th 83, 139.)

Indeed, "it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. '"If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment."'" (*People v. Bean* (1988) 46 Cal.3d 919, 932-933.)

As indicated, the thrust of Humes's substantial evidence claim is that Reinhardt's pretrial and in-court identifications of him were unreliable. As we have explained, the "other crimes" evidence of the Encinitas robbery, and Kenny's pretrial identification of Humes as one of the Encinitas robbers, was properly admitted. To support his challenge to the reliability of Reinhardt's identifications, Humes points out that "'eyewitness identification . . . is of dubious reliability,'" and argues there were numerous reasons to doubt or discredit Reinhardt's identifications, including the fact she was under stress, and the crimes were extremely traumatic for her.

None of these arguments render Reinhardt's identifications of Humes incredible or unreliable as matter of law, however, as much as Humes would like to discredit them based on Dr. Shomer's testimony, or various factors that defense counsel had ample opportunity to cross-examine Reinhardt on. As the People point out, a single eyewitness's identification of a suspect as the perpetrator is sufficient to sustain a conviction (*People v. Boyer* (2006) 38 Cal.4th 412, 480-481) and an appellate court may consider a witness's testimony "inherently incredible" only if it is physically impossible,

38

or its falsity is apparent without resorting to inferences or deductions (*People v. Thompson* (2010) 49 Cal.4th 79, 124). Neither criteria is present here.

The decision whether to credit Reinhardt's pretrial and in-court identifications of Humes was a matter for the jury to decide, and the jury had ample reason to credit the identifications. (*People v. Boyer, supra,* 38 Cal.4th at p. 481.) As indicated, Reinhardt identified Humes in court as the robber, saying his face was "burned into [her] brain" and her certainty of her identification was "[e]xcellent. Very high." She got a good look at Humes's face when he first walked into the store and again when she was emptying the registers. On May 19, 2009, two weeks after the Murrieta robbery, Reinhardt identified Humes from a six-pack photographic lineup, saying: "This one for sure." In sum, Reinhardt's identifications of Humes were reasonable, credible, and of solid value. For this reason, we reject Humes's substantial evidence claim.

F. *No Cumulative Error*

Humes claims the cumulative effect of the trial court's and his defense counsel's errors deprived him of a fair trial. (*People v. Hill* (1998) 17 Cal.4th 800, 845-847.) As discussed, the only error was the admission of Detective Casey's testimony that Humes and Guy were the two robbers seen in the surveillance videotape of the Encinitas robbery. And for the reasons discussed, there is no reasonable probability that error affected the verdicts or findings against either defendant.

G. *No Remand for Retrial on Humes's Additional Prison Priors*

The trial court found insufficient evidence to support three of the seven prison priors alleged against Humes, namely, prison prior allegations Nos. 1, 2, and 7, and concluded its finding was a legal bar to retrial on those prison priors. The People claim the trial court was incorrect, because retrial on priors is not precluded by double jeopardy or other principles, relying on *Monge v. California* (1998) 524 U.S. 721, 734, *People v. Barragan* (2004) 32 Cal.4th 236, 240-250, and *People v. Watts* (2005) 131 Cal.App.4th 589, 597. Accordingly, the People ask this court to remand the matter for a retrial on the three prison prior allegations.

Humes counters that the People have offered no authority, and the cases cited by the People do not support the proposition, that remand for retrial on prior conviction allegations is proper when, as here, (1) the *trial court* found the People presented insufficient evidence to support the priors, (2) the People did not ask the trial court to allow them to retry Humes on the priors, and (3) the People did not appeal from any resulting "order made after judgment, affecting the substantial rights of the people." (§ 1238, subd. (a)(5).) In sum, Humes argues the People have forfeited their right to retry him, in this case, on the three prison prior allegations. We agree with Humes, and deny the People's request.

## IV. DISPOSITION

The judgments are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

KING
                                                              J.


We concur:

RAMIREZ
                    P. J.

HOLLENHORST
                    J.